FILE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

C.H.,

11 CIV 3462

                                        Plaintiff,

            -against-                                        **COMPLAINT**

NEW YORK CITY DEPARTMENT OF EDUCATION
a/k/a THE BOARD OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF THE CITY OF NEW YORK,

                                        Defendant.

## PRELIMINARY STATEMENT

1.     Plaintiff, a disabled student, brings this action for declaratory and injunctive relief
pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400 et
seq. ("IDEA"[1]) and 42 U.S.C. §1983, alleging that the Defendant school district denied her
access to a free appropriate education ("FAPE").

2.     This action also seeks declaratory and injunctive relief under the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act of 1973, 29
U.S.C. § 794 ("Section 504"), and pursuant to New York State statutes and regulations that
implement the IDEA, N.Y. Educ. Law §§ 4401 et seq. and 8 N.Y.C.R.R. §§ 200 et seq.

3.     Plaintiff further seeks to enforce an order of an Impartial Hearing Officer after a
hearing held pursuant to the IDEA, directing Defendant New York City Department of
Education ("NYC DOE" or "DOE") to place the Plaintiff at the Judge Rotenberg Center ("JRC")

---

[1]  The Individuals with Disabilities Education Improvement Act amended and restated the Individuals with
Disabilities Education Act, which was known by the acronym "IDEA."  The amended statute is sometimes referred
to as the "IDEIA," especially if there is a focus upon a provision in the IDEIA that amended the IDEA.  In this
Complaint, we use the acronym "IDEA."

(a state-approved nonpublic special education school) for the 2010-2011 school year and to amend Plaintiff's Individualized Educational Plan ("IEP") to reflect such placement.

4. Plaintiff has exhausted administrative remedies before a school district impartial hearing officer ("IHO") and before the State Review Officer ("SRO") and is timely commencing this action (see N. Y. Educ. Law § 4403 (3)(A); 20 U.S.C. § 1415(i)(2)(B)).

## INTRODUCTION

5. Plaintiff is a severely disabled young woman who endured a traumatic infancy and early childhood of abuse and neglect. A New Yorker from birth, her developmental disabilities and mental illness were recognized by the Defendant early in her schooling. She had a long history of special education placements.

6. In October 2007, Plaintiff was arrested and charged with felonies involving sexual misconduct. She was remanded pre-trial, and incarcerated at Rikers Island. The Kings County District Attorney promptly recognized that there was a probable relationship between Plaintiff's mental and developmental disabilities, and her alleged crime, and proposed to Plaintiff's defense attorney that her case be referred to the Brooklyn Mental Health Court, and this was accomplished.

7. Forensic psychological and psychiatric testing was performed under the auspices of the Mental Health Court. Based on that data, the presiding judge, the DA, and the defense attorney concurred that Plaintiff's case belonged in this specialized part of the court, and that the desired outcome of the case would involve a diversion from a correctional setting to a residential therapeutic and educational placement. The funding for such a placement, however, had to be secured from an agency or organization external to the Court, the District Attorney, or the Department of Corrections.

8.      For three years, Plaintiff languished in pre-trial detention while the court's support network and Plaintiff's defense attorney tried unsuccessfully to secure a diversion placement. The Plaintiff's condition deteriorated, and after suicide attempts she was hospitalized for nine months at a maximum security hospital of the NYS Office of Mental Health. She returned to Rikers Island in September 2009.

9.      The Defendant had a Committee on Special Education ("CSE") at Rikers Island that was responsible for providing appropriate special education services to the Plaintiff, under legal standard of federal and state law and pursuant to a federal court structural injunction decree compelling the Defendant to fulfill its responsibilities to school-age youths incarcerated in New York City jails. One of the determinations that the CSE could have made (and should have made) was to recommend that the Plaintiff be placed in a state-approved residential therapeutic nonpublic school ("NPS"), contingent upon approval of a diversion disposition by the Mental Health Court.

10.     Plaintiff's defense attorney applied to a state-approved NPS, and it accepted the Plaintiff, subject to the securing of a funded placement by the Defendant. In June 2010, both the defense attorney and an education law attorney who took on representation of the Plaintiff, communicated with the CSE and requested that the Plaintiff be re-evaluated and promptly given a placement recommendation for an NPS. The CSE was told that an NPS had already offered her admission, that it was an NPS to which the Mental Health Court had diverted other youths, and that the presiding judge indicated that he was very favorably disposed to a disposition sending the Plaintiff to that NPS.

11.     The CSE did not re-evaluate the Plaintiff, much less offer an NPS placement. The education attorney commenced an impartial hearing pursuant to federal and state education law.

3

After an evidentiary hearing, the IHO issued a Decision and Order directing the Defendant to place the Placement at the NPS forthwith, and other relief. Relying upon that IHO order, the NPS agreed to enroll the Plaintiff. At the next court appearance the presiding judge approved a plea agreement and sentenced the Plaintiff to supervised probation provided she was enrolled at the NPS. The Plaintiff was transported forthwith to the NPS where she remains currently, thriving after a nightmarish childhood and young adulthood capped by three years of incarceration and psychiatric hospitalization.

12.     The Defendant appealed the IHO Decision and Order to the State Review Officer ("SRO"). The SRO sustained the appeal in part. The IHO had made several findings that could support the relief requested, and ordered more than one remedy. While the SRO reversed some of the findings and one of the remedial orders, the SRO affirmed the IHO's finding that the Defendant had denied the Plaintiff a free appropriate education for the 2009-2010 school year. The SRO also would not sustain the Defendant's appeal from the IHO order directing the Defendant to place the Plaintiff at the NPS and to issue an Individualized Educational Program ("IEP") that confirmed the NPS as her educational placement. The SRO found that this part of the appeal was moot. The SRO did not reverse, vacate or annul the IHO order.

13.     After the SRO decision, Plaintiff demanded that the Defendant comply with the undisturbed IHO order directing her placement at the NPS and issue a conforming IEP. The Defendant refused, claiming that the SRO's mootness ruling exonerated its obligations under the undisturbed IHO order.

14.     Plaintiff's First Claim seeks an injunction for enforcement of the IHO order that was not disturbed by the SRO decision but the Defendant is flouting.

4

15.     Plaintiff's Second Claim is that the Defendant deprived the Plaintiff of FAPE for the 2010-2011 school year and Plaintiff was entitled to public funding of her tuition at JRC for that school year.

16.     Plaintiff's Third Claim asserts that the Defendant violated the IDEA and a federal court decree by refusing to issue a "Nickerson Letter" (see infra), and the SRO erred in overturning the IHO's order for a Nickerson Letter.

17.     The Fourth Claims is that the Defendant deprived the Plaintiff of FAPE for the 2008-2009 school year and the SRO erred in reversing the IHO finding of a violation.

18.     The Fifth Claim arises under the Americans with Disabilities Act, and the Sixth Claim under Section 504 of the Rehabilitation Act.

19.     The Sixth Claim seeks a declaration that the NPS where the Plaintiff is enrolled is her "stay put" or pendency placement.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action under 20 U.S.C. §1415(i)(2)&(3); under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States; and under 28 U.S.C. § 1343(a), in that claims are asserted under laws providing for the protection of civil rights.  This Court may exercise supplemental jurisdiction over Plaintiff's state law claims.

21.     Venue is proper under 28 U.S.C. § 1391(b) in that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this Judicial District, and because the Defendant performs its official duties and has its principal offices in this Judicial District.

22.     If successful, Plaintiff is entitled to costs and attorneys fees under 42 U.S.C. § 1988(b), 20 U.S.C. § 1415(i)(3) and 29 U.S.C. § 794a(a)(2).

## PARTIES

23.    Plaintiff C. H. is a student with a disability within the meaning of the IDEA, Section 504, and the ADA.

24.    Plaintiff's residence was Brooklyn, New York, at the time of her being taken into custody and incarcerated by the New York City Department of Corrections.

25.    At all times material hereto, Plaintiff was a member of the certified class of plaintiffs in each of below-named federal actions in which the district courts have issued institutional reform decrees that order the Defendant, inter alia, to adopt and implement procedures and practices that prevent or remedy deprivations of FAPE:[2]

> a.    New York City prison inmates between the ages of 16 and 21.   Handberry v. Thompson, 219 F.Supp.2d 525 (S.D.N.Y. 2002) (Memorandum Decision and Order and full text of remedial decree), aff'd in part vacated  in part, 446 F.3d 335 (2d Cir. 2006); and
>
> b.    Handicapped children between the ages of 5 and 21 living in New York City. Jose P. v. Ambach, 79 Civ. 270 (EHN) (E.D.N.Y. 1979).[3]  See, e.g., Jose P. v. Ambach, 557 F.Supp. 1230 (E.D.N.Y. 1983); Jose P. v. Ambach, Opinion and Order dated Jan. 5, 1982, 553 IDELR 298 (E.D.N.Y. 1982).

26.    Initials are used to identify the Plaintiff in the pleadings and briefs filed in this action to preserve the confidentiality of Plaintiff in conformity with the privacy provisions of the IDEA, 20 U.S.C. §1417(c), and the Family Educational and Privacy Rights Act ("FERPA"), 20 U.S.C. §1232g.

---

[2]  C.H. is not a named plaintiff in either action.

[3]  The case, commonly known by the short title, "Jose P. v. Ambach" or simply "Jose P.," was comprised of three class actions, all filed in the United States District Court for the Eastern District of New York in 1979, and assigned to Judge Eugene H. Nickerson.  The other two docket numbers were 79-cv-560 and 79-cv-2562.  Judge Nickerson heard the three cases in consolidated fashion.  In 1996 the court assigned a new docket number to Jose P. under which all papers were docketed prospectively, 96-cv-1834.

27.     Defendant NEW YORK CITY DEPARTMENT OF EDUCATION a/k/a THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK ("District") is a municipal corporation, created pursuant to Article 52-A of the New York State Education Law, N.Y. Educ. Law §§ 2590 et. seq. (2010).

28.     Defendant, in accordance with the IDEA and Article 89 of the New York State Education Law ("Article 89"), is responsible for providing FAPE to New York City resident students between the ages of 3 and 21, who have been classified as children with disabilities in need of special education services.  N.Y. Educ. Law §§ 4401 et seq. (2010).

29.     Defendant is the recipient of federal funds.  It is responsible for the operation of special education services and programs in the New York City school system in accordance with federal, state and local law, and has the responsibilities of a Local Education Agency ("LEA") under the IDEA.

30.     Defendant's principal offices are located at 52 Chambers Street, New York, New York 10004.

## FACTUAL ALLEGATIONS

### *Pre-incarceration*

31.     C.H. is a severely disabled individual.

32.     C.H. was born on January 3, 1990 in Brooklyn, New York.

33.     C.H.'s mother suffered from schizophrenia, abused alcohol and drugs, and engaged in prostitution.

34.     In C. H.'s infancy, officials removed C.H. from her biological mother and placed her in foster care.  In the foster home, however, C.H. was severely abused and neglected.

35.     C.H. was confined to a crib for three years, and her foster mother, who was a substance abuser, sexually abused the little girl.

7

36.    At age four, C.H. was removed from that foster home and placed into the custody of a second foster mother, Ms. T. B., who subsequently adopted her.

37.    As a child, C.H. had many developmental problems including delays in communicating and walking.  Also, she was diagnosed with Spritzer Disorder, a hereditary condition characterized by small head, protruding nose, and small mouth containing an excessive number of teeth.

38.    Also, C.H. exhibited signs of mental illness and anger problems including cruelty to animals and sexually inappropriate behaviors.

39.    At eleven years of age, C.H. had auditory hallucinations (e.g. hearing voices) which led her to start fires.  She was admitted to a psychiatric hospital.

40.    At thirteen years of age, C.H. began running away from home, engaging in substance abuse and in sexually indiscriminate behaviors.  While prostituting, she was kidnapped, held for one month against her will, beaten and severely victimized.

41.    At sixteen years of age, C.H. was referred for a psychological evaluation to Kings County Hospital Center ("KCHC").  She was diagnosed with Psychosis, NOS; Cannabis and Alcohol Abuse; R/O Schizophrenia.  Psychotropic and antipsychotic medications were prescribed for her, Depakote, Risperidone, and Chlorpromazine.

42.    The psychological evaluation at KCHC revealed a significant discrepancy between C.H.'s verbal skills, falling in the extremely low range, and non-verbal skills, falling in the low average functioning range, resulting in a full score IQ of 54, which is consistent with the diagnosis of Mental Retardation.

43.    At 17 years of age, on July 16, 2007, C.H. was admitted to the Brooklyn Children's Center ("BCC") Day Treatment Program.  Her diagnosis on intake included Bipolar

Disorder, Post-traumatic Stress Disorder under Axis I and History of Lead Intoxication, Sickle Cell Trait and Spritzer Disorder under Axis III.  Plaintiff was taking Risperidone, Valproate, and Benzoyl.

44.    On or about August 16, 2007, C.H. was evaluated by BCC's attending psychiatrist, who noted a long history of auditory hallucinations, self-mutilation, inappropriate sexual behaviors, and runaway behaviors, which had led to two previous inpatient hospitalizations at BCC and long-term day treatment placement.

45.    About two months later, she was formally discharged from BCC.  Her exit diagnosis included Psychotic Disorder, NOS and Bipolar Disorder, NOS (Axis I); Moderate Mental Retardation (Axis II).  She was given a prescription for a continued regimen of psychotropic medications.  The occasion for her discharge was her arrest and incarceration, infra.

*Incarceration*

46.    On or about October 8, 2007, C.H. was arrested.  She was charged with conduct that resulted in her being indicted for criminal sexual act in the first degree, sex abuse in the first degree, and endangering the welfare of a child.

47.    C.H. was remanded for pre-trial detention to the custody of the New York City Department of Corrections and incarcerated in the Rose M. Singer Center of the Rikers Island jail complex.

48.    C.H.'s incarceration necessitated her formal discharge from the BCC Day Treatment Program.

49.    The Office of the Kings County District took notice of C.H.'s long history of mental illness and developmental delays, and suggested to her defense counsel that it would be appropriate to refer her case to the Brooklyn Mental Health Court.

50.    Brooklyn Mental Health Court ("BMHC") is a specialized court that was developed by the Office of Court Administration, the NYS Department of Mental Hygiene, and the Center for Court Innovation, to address the problems posed by having mentally ill individuals in the criminal justice system.

51.    Cases are presided over by a Justice of the New York State Supreme Court, who uses the authority of the court to link defendants with serious and persistent mental illness who would ordinarily be jail-or prison-bound to long term treatment (and education, for school-age youthful offenders) as an alternative to incarceration.

52.    On consent, C.H.'s case was referred to BMHC and assigned to the Hon. Matthew J. D'Emic, Acting Justice of the Supreme Court.

53.    C.H., through counsel, requested a diversion disposition that would allow her to attend a residential therapeutic school.  Upon review of the case and the expert reports generated through the BMHC, Justice D'Emic responded that his assessment was that a placement at a residential therapeutic school would be appropriate.

54.    BMHC, however, does not have funds to pay for sought after diversion placements.  C.H.'s three-year pre-trial incarceration prior to her placement at JRC was caused by the inability of the parties, the court's support resources, or external social service agencies and organizations, to identify an appropriate funded placement.

55.    In 2008, C.H.'s defense counsel from Brooklyn Defender Services ("BDS"), Joyce Kendrick, and an advocate from the EAC TADD LINK Program,[4] Lauren D'Isselt, referred C.H. for an independent forensic psychological evaluation.

---

[4]Treatment Alternatives for the Dually Diagnosed (TADD) is a prosecution-run program which uses the Kings County District Attorney's Drug Treatment Alternative-to-Prison (DTAP) evidence-based, deferred-sentencing model. The District Attorney's Office determines the eligibility of a TADD candidate and makes the treatment diversion plea offer. Clinical assessments, case management services, and monitoring of treatment compliance are

56.     The purpose of the evaluation was to determine the extent of C.H's cognitive limitations, the potential impact of the limitations on her treatment, and further calibration of the assessment of whether she was mentally retarded.

57.     Ali Khadivi, Ph.D. performed the evaluation on June 10, 2008.  She interviewed Plaintiff and her foster parent, administered the WAIS III and Vineland II assessment instruments, and reviewed available records.  Dr. Khadivi's findings, inter alia, were that C.H's full scale IQ fell in the borderline intellectual functioning range and that she demonstrated cognitive deficits in multiple areas of functioning.  Dr. Khadivi concluded that C.H. met the criteria for Borderline Intellectual Functioning with diagnoses of Bipolar Disorder, Post-Traumatic Stress Disorder and Cannabis Abuse.

58.     After the forensic psychological examination, a forensic psychiatric evaluation was performed by Alexander Sasha Bardey, M.D. on November 21, 2008.  Its purpose was to assess C.H.'s ability to stand trial and to determine the relationship between the alleged criminal sex act and her mental illness.

59.     Based on his clinical interview, Dr. Bardey opined that as a result of repeated and frequent sexual abuse in the past C.H. did not appreciate the inappropriate nature of her behavior. He also concluded that C.H.'s limited cognitive abilities and her mental disease, namely schizophrenia, prevented her from appreciating the nature and consequences of her actions.

60.     In December 2008, Plaintiff's mental condition significantly deteriorated.  Twice, she attempted to commit suicide by hanging.  As a result, she was transferred from Rikers Island to the Kirby Forensic Psychiatric Center ("KFPC"), a maximum security hospital of the NYS Office of Mental Health, which provides secure treatment and evaluation for forensic patients

provided by a nonprofit agency, the Educational Assistance Corporation (EAC) TASC and EAC-LINK (http://consensusproject.org/program_examples/treatment_alternatives_for_the_dually_diagnosed_tadd)

and for the courts of New York City and Long Island.   C.H. was hospitalized there for nine months, until September of 2009.

61.    On October 9, 2009, after her transfer back to Rikers Island, Plaintiff was evaluated by a psychiatrist, Dr. Dillon Euler,.  He determined that her propensity to engage in dangerous and self-destructive behaviors would be dramatically reduced if she were to be sober and compliant with medications in a supervised, residential setting with psychiatric treatment to provide alternate coping strategies.

62.    C. H. was transferred back to Rikers Island, where she re-registered to receive educational services from the Defendants.

### Committee on Special Education Actions During Incarceration

63.    Long before her incarceration, C.H. was identified by Defendant as a student with an educational disability.  Her classification, using the IDEA legal categories, was "Emotional Disturbance."

64.    The Defendant's Committee on Special Education ("CSE") was responsible for evaluating C.H.; determining her needs for special education and related services; producing an IEP for each school year that summarized the evaluations, set long term and short term goals, and prescribed a placement and services where her needs would be met; and reviewing the IEP whenever requested by the parent (or adult student) but in no event less frequently than annually.

65.    The Defendant failed to proffer in the administrative proceedings any of C.H.'s educational records for the time prior to her incarceration.

66.    The Impartial Hearing Officer issued a subpoena duces tecum directing the Defendant to produce C.H.'s last IEP prior to her incarceration.  The Defendant did not produce it.

67.     The Defendant is responsible for providing educational services, including special education services if the student has an IEP, for youths who are incarcerated in New York City.

68.     The Defendant operates schools within the confines of the Rikers Island jail complex.

69.     Shortly after her incarceration, C.H. enrolled in the Island Academy, one of the schools operated by the Defendant on Rikers Island.

70.     The Defendant operates a School Based Support Team ("SBST") that functions as the Defendant's CSE that is responsible for special education students who are enrolled at the Island Academy.

71.     When a student like C.H. enrolls in the Island Academy with a pre-existing IEP, the CSE is responsible for implementing the IEP, provided, however, that under some circumstances the program prescribed in the IEP can be temporarily modified because of the security needs of the correctional facility.  The temporarily modified educational program is designated a "TEP" in the decree in Handberry v. Thompson, supra.

72.     On October 25 and 26, 2007, Plaintiff was evaluated by Defendant's staff using the STAR reading and math assessment instruments while attending the Island Academy at Rikers Island.  The assessments showed that Plaintiff's general reading skills were on 2.6 grade level and general math skills were on 2.2 grade level.

73.     On or about October 31, 2007, Defendant's staff created a "SETSS Teacher Student Plan" which indicated that it was intended to assist Plaintiff with her reading and math abilities while attending the Island Academy.  The one-page document cursorily lists four goals and four objectives.

74.    On or about November 29, 2007 Defendant created another document, which it called a special education plan, or "SEP," a designation that does not exist in the IDEA, the New York Education Law, or the <u>Handberry v. Thompson</u> decree.

75.    The SEP contained a single reading goal and a single math goal.  The "social/emotional" component of the SEP for this severely emotionally disturbed youth merely stated that she will improve in social skills necessary for self-improvement.

76.    On January 22, 2008, Defendant administered the STAR tests of academic skills again.  C.H.'s reading skills decreased from 2.6 to 2.2 grade level while her math skills increased from 2.2 to 2.4.

77.    On or about September 2, 2008, there was another administration of STAR tests, scoring C.H.'s reading and math levels at 3.4.

78.    On October 16, 2008, Defendant produced a superseding SEP, a one page document substantially similar to the previous one.  It contained a transition plan indicating that she will have access to information and linkage to community resources, however, the transition (from jail to community) plan did not contain any specific vocational interests or resources.

79.    The social worker testified[5] that the transition plan was not specific because the CSE did not know how long C.H. would be incarcerated and whether she would have any access to such resources.  She also testified, however, that with other similarly situated inmates the CSE had made a program recommendation, "Defer to CBST."  This constitutes a recommendation for the Defendant to place the student in a special education NPS conditional upon the student's release from incarceration.[6]

---

[5]  All references to testimony refer to testimony of witnesses at the impartial hearing.

[6]  "CBST" refers to the Defendant's Central Based Support Team.  This is a centralized (i.e. serving the entire school district) department of the DOE that is tasked with apply to appropriate NPS's for admission of the students whom the CSE has recommended for placement in an NPS.

80.    When C.H. returned to Rikers Island in September 2009, it was early in the 2009-2010 school year.

81.    Defendant's social worker and CSE did not request or receive any of the psychological and psychiatric evaluations conducted during C.H.'s incarceration on Rikers Island and inpatient hospitalization at KFPC.

82.    Defendant did not create any SEP at all (or IEP or TEP) for the 2009-2010 school year, or thereafter.

83.    During the 2009-2010 school year, C.H. attended classes on 40 days, and she received counseling services from a DOE social worker, Renee Wilson. Although her school attendance was diminished (the DOE could not compel her participation), C.H. did not withdraw her request for educational services.

84.    The social worker testified that the purpose of her counseling was to help C.H. to develop her strengths and manage her emotional weaknesses resulting from the prolonged detention and issues that led to it. She also provided C.H. with vocational advisement which she defined as "help to identify some of her career interests, and helped her in developing a plan towards that end."

85.    As of June 2010, the Mental Health Court along with the BDS attorneys and advocates from the EAC Link had exhausted all options for a funded diversion placement. At that time, however, C.H.'s defense attorney had identified one NPS with an appropriate program, and had secured an acceptance letter for C.H.'s admission. The NPS was JRC.

86.    Justice D'Emic was familiar with JRC, having permitted release on probation of another BDS client to the facility after DOE funding had been secured. The potential release of C.H. to JRC was discussed during court appearances among Justice D'Emic, Ms. Kendrick, the

Assistant District Attorney, C.H. and, at times, a representative of JRC. Justice D'Emic indicated that he viewed favorably Ms. Kendrick's proposal that there be a disposition of C.H.'s case that included her transfer from Rikers Island to JRC, and follow-up monitoring of her progress by the Court, probably on a monthly basis.

87. On June 15, 2010, C.H.'s education rights attorney, Anton Papakhin, spoke to Defendant's social worker and advised her that he was working with C.H.'s criminal defense attorney to locate and provide C.H. with an alternative placement in a residential treatment program.[7]

88. The social worker testified that after speaking to C.H's attorneys on June 15 and June 16, 2010, she was ready to proceed with the requested CSE review upon receiving consent to proceed from C.H. She understood the attorneys to be requesting an IEP placement recommendation of "defer to CBST" for a residential therapeutic school placement.

89. The social worker had in person meetings with C.H. on June 15 and 18, 2010. The social worker told C.H. about her discussions with C.H.'s attorneys and talked with C.H. about how the Island Academy CSE could help to facilitate Plaintiff's transfer from Rikers to an appropriate residential treatment program.

90. During her two meetings with C.H. about her attorneys' requests on C.H.'s behalf for a CSE review and a recommendation of "Defer to CBST" for a residential placement, the social worker did not provide C.H. with a consent form for her signature or otherwise ask C.H. to give other than an oral confirmation that she wanted a CSE review and a residential school placement.

---

[7] At the hearing, Defendant's social worker initially denied that the undersigned counsel specifically requested that the Island Academy SBST to hold a CSE review for the purpose of recommending a residential placement on Plaintiff's IEP. Then the social worker admitted that the criminal defense attorney specifically told her that she wanted the IEP "to denote that residential treatment is recommended." Social worker did not know if Plaintiff had a CSE review over the summer because she was on vacation.

91.    Attorney Kendrick's requests to the social worker for the Defendant to provide the necessary evaluations and conduct the necessary review to make a recommendation for placing C.H. in a residential program included a faxed written request on behalf of C.H. and telephone calls.  Eventually the social worker told Ms. Kendrick that she did not know whether a review could take place until after the end of the school year.

92.    C.H.'s education attorney filed a due process complaint (a/k/a impartial hearing request) dated June 17, 2010.

### Impartial Hearing Officer Findings of Fact, Decision, & Order

93.    C.H.'s due process alleged that the Defendant had deprived her of FAPE for the current 2009-2010 school year and proposed resolution of the about-to-commence 2010-2011 school year.[8]

94.    C.H. alleged that she required a placement in a residential therapeutic school in order to receive FAPE, and specifically requested an order that would result in her being funded at a placement at JRC, the appropriate state approved NPS that had already offered her admission, or, in the alternative, another appropriate approved NPS that would admit her forthwith.

95.    A requested remedy for the Defendant's denial of FAPE was an order directing the Defendant to fund the JRC placement prospectively.

96.    A requested remedy for Defendant's failure to make a timely evaluation and/or placement was an order directing the Defendant to issue a "Nickerson Letter" (referring to the late Hon. Eugene Nickerson, whose orders in the Jose P. case mandated the issuance of such letters), also known as a "P-1" letter (the designation in Defendant's Standard Operating

---

[8]  The impartial hearing request also alleged denial of FAPE for the 2008-2009 school year.  "Resolution" refers to a settlement process mandated by federal and state regulations to take place within 30 days of the filing of the due process complaint.

Procedures Manual ["SOPM"], which has internal procedures that were adopted to implement Judge Nickerson's orders.) A Nickerson Letter is entitles the parent (or adult student) to select and gain admission to an approved NPS and have it funded by the Defendant.

97.    C.H. also requested an order directing Defendant to develop an IEP for her including residential placement at JRC.

98.    After receiving the due process complaint, Defendant failed to conduct a resolution meeting as required by Federal and State regulations. See 34 C.F.R. § 300.510[a]; 8 NYCRR § 200.5[j][2].

99.    Instead of answering the due process complaint, the Defendant filed a notice of insufficiency and requested dismissal. The IHO denied the application on or about July 12, 2010. Despite the IHO's ruling, Defendant never filed an answer to the complaint as required of it by 8 NYCRR § 200.5[i][4].

100.    A school district has the initial burden of proof at an impartial hearing, to show it provided FAPE. The Defendant delayed going forward with its evidentiary case for two months by requesting and receiving (over Plaintiff's objections) continuances. The Defendant represented to the IHO that it would use the time to "investigate" the Plaintiff's allegations.

101.    Even after being giving two extra months to investigate the facts, and notwithstanding the receipt of an IHO-issued subpoena duces tecum, the Defendant failed to produce a copy of C.H.'s last pre-incarceration IEP, which was dated, upon information and belief, March 21, 2007, or any other pre-incarceration educational records.

102.    C.H.'s defense attorney testified at the hearing that if the IHO ordered funding for placement at JRC or any other residential program she would present such order to Justice

D'Emic for consideration of Plaintiff's release and transfer to such facility where she can receive proper education and treatment.

103.    The IHO granted the due process complaint.

104.    The IHO Decision and Order was dated October 18, 2010, however, the IHO subsequently made errata corrections to the decision and evidence list, dated October 29, 2010 and November 2, 2010. [9]

105.    The IHO signed an official "Pay Order" form that entered into the records of the New York City Department of Education Impartial Hearing Office.  The Pay Order stated, inter alia,

> IT IS FURTHER DIRECTED THAT A "Nickerson letter" is hereby authorized for the student for the 2010-2011 school year.  Alternatively, child is directed to be placed at Judge Rotenberg Center for the 2010-2011 school year upon transfer from Brooklyn Mental Health Court.

106.    The IHO found that C.H. had not been properly and timely evaluated and placed for the 2010-2011 school year.  The remedy for this violation was to order the Defendant to issue a Nickerson Letter.

107.    The IHO found that JRC was an appropriate placement for C.H.

108.    As an alternative relief the IHO found that there was a serious breakdown in Defendant's administrative process which created a demonstrable deprivation of special education services to C.H.  The remedy for this violation was "to order that [C.H.] be placed at the Judge Rotenberg Center for the 2010-2011 school year upon the appropriate order from [Justice] D'Emic," and that "[a]n IEP should therefore be created to reflect placement at Judge Rotenberg Center."  See also Pay Order quoted supra.

---

[9]  A complete assemblage of the final version of the IHO decision and orders consists of the Cover Page and Body of Decision dated November 2, 2010; the Evidence List attached to the first corrected decision dated October 29, 2010; and the copy of the Pay Order, attached to the original decision dated October 18, 2010.

109.    The IHO further found that there was a deprivation of FAPE for the 2008-2009 and the 2009-2010 school years and that JRC was an appropriate residential placement for Plaintiff.

110.    At no time between the commencement of the impartial hearing on June 18, 2010 and the issuance of the corrected IHO Decision on November 2, 2010, did Defendant begin its evaluation and placement process in order to provide Plaintiff with an appropriate residential placement, nor has it ever created an IEP or an SEP for the student after October 16, 2008.

111.    At no time did Defendant create an IEP for Plaintiff for the 2010-2011 school year, nor did it make any educational placement recommendation for the 2010-2011 school year.

112.    The defense attorney presented the IHO Decision to the Mental Health Court. On November 4, 2010, C.H. entered into a plea agreement in her criminal case. Justice D'Emic sentenced C.H. to probation with diversion to JRC, beginning immediately. C.H. transmitted to JRC and enrolled there the same day.

113.    Since November 4, 2010, C.H. has been transported from JRC to appearances at the Mental Health Court approximately once a month. Justice D'Emic has found her progress at JRC to be very good and she continues to be enrolled there.

*State Review Officer Decision*

114.    Defendant filed a Verified Petition dated November 22, 2010 ("DOE Petition") with the Office of State Review appealing, in part, the IHO decision and orders.

115.    On January 24, 2011 the SRO issued a decision ("SRO Decision").

116.    The SRO ruled that the IHO erred in finding that Defendant failed to offer Plaintiff a FAPE for the 2008-2009 school year.

117.    The SRO sustained the IHO's finding that Defendant failed to offer Plaintiff a FAPE for the 2009-2010 school year.

118.    The SRO did not grant the Defendant's appeal of the IHO's order directing Defendant to place Plaintiff at JRC at public expense for the 2010-2011.  The IHO stated that the order for the 2010-11 school year was moot because "neither party has offered any evidence to suggest that a contrary determination would in any way impact or alter the Mental Health Court's order placing the student at NPS for the 2010-11 school year, and thus, would not afford the parties any meaningful relief." The SRO did not vacate or annul the IHO order.

119.    The SRO granted the Defendant's appeal of the IHO order directing the issuance of a Nickerson letter to fund placement at JRC 2010-2011 school year, stating that an appropriate equitable remedy for the Defendant's violation of Plaintiff's rights in this case would be an award of additional educational services or an independent educational evaluation at Defendant's expense.

<u>FIRST CLAIM</u>

120.    The IHO Decision and the accompanying Payment Order expressly provide that Defendant must place Plaintiff at JRC for the 2010-2011 school year upon the appropriate order from the Mental Health Court and that the Defendant must develop an IEP to reflect placement at JRC.

121.    The Defendant understood the meaning and operative effect of the IHO order, namely, that once the Mental Health Court authorized the transfer of the Plaintiff from the Department of Corrections to be enrolled at JRC, then the Defendant would become responsible for paying the cost of the JRC placement.

122.    The Defendant formally pleaded this position regarding the meaning and operative effect of the IHO order in its Verified Petition ("DOE Petition") filed with the State Review Officer.

123.    The DOE Petition informed the SRO that after the IHO Decision the Mental Health Court had approved the Plaintiff's enrollment at JRC and that as of the date of the Petition the Plaintiff was enrolled there.

124.    The last point heading in the DOE Petition reads:  "Notwithstanding that the Student is Currently at JRC Pursuant to Her Plea Agreement, the Instant Appeal is Not Moot."

125.    The DOE Petition further asserts that notwithstanding the effectuation of the placement at JRC "the issue of which entity or entities should be financially responsible for such placement at JRC remains a live controversy."  One reason for this, it stated, was that "the Mental Health Court has not ordered the DOE to pay for the Student's attendance at JRC; rather, upon information and belief, JRC has assumed the risk of the Student bringing a successful IDEA claim for funding to finance her stay at JRC pursuant to the Court's permission for her to attend JRC as part of its diversion program.  DOE Petition ¶¶ 64–65.

126.    The Defendant's position on appeal to the SRO was that unless the SRO reversed the IHO finding that the Defendant had denied FAPE, and unless the SRO reversed, vacated or annulled the IHO Decision and Payment Order, then the Defendant must put JRC on the Plaintiff's IEP and fund her placement at JRC.

127.    The SRO sustained the IHO's finding that the Defendant denied FAPE for the 2009-2010 school year.

128.    The SRO did not reverse, vacate or annul the IHO order directing Defendant to place Plaintiff at JRC at public expense for the 2010-2011 school year.

129.    The SRO did not sustain the Defendant's appeal from the order.

130.    Following the SRO Decision the DOE had a legal duty to comply with the undisturbed IHO order to place C.H. at JRC.

131.    Following the SRO Decision, Plaintiff's counsel communicated with Defendant's counsel and demanded that the Defendant comply with the IHO order.

132.    Defendant's counsel responded that the Defendant neither would comply with the IHO order nor appeal the SRO decision that let that order stand.

133.    Defendant's asserted justification for noncompliance was that the SRO ruling that the DOE appeal was moot operated as a reversal and nullification of the IHO order.

134.    The Defendant is barred as a matter of law from relying on this ground under the principle of estoppel against the assertion of inconsistent positions.

135.    The Defendant's asserted ground for noncompliance with the IHO order is invalid on the merits, because the IHO order is undisturbed and the DOE must obey.

136.    The Defendant did not convene a CSE review to develop an IEP for residential placement at JRC or to develop an alternative program recommendation to for the 2010-2011 school year.

137.    Defendant's refusal to obey and implement the IHO Decision and Order blatantly contradicts its terms, having the effect of depriving Plaintiff of the free appropriate education guaranteed by the IDEA, 20 U.S.C. § 1400, et seq., and the regulations promulgated thereunder.

138.    Defendant's refusal to obey and implement the IHO Decision and Order blatantly contradicts its terms, having the effect of depriving Plaintiff of the free appropriate education guaranteed by the IDEA, 20 U.S.C. § 1400, et seq., and the regulations promulgated thereunder, and thus deprives her of rights secured by federal law in violation of 42 U.S.C. § 1983.

## SECOND CLAIM

139.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

140.    Defendant's failure to offer Plaintiff an appropriate educational program in the least restrictive environment deprived Plaintiff of a FAPE for the 2010-2011 school year in violation of her rights under his rights under the IDEIA, 20 U.S.C. §§ 1400 et. seq.; Section 504 of the Rehabilitation Act of 1973, codified at 29 U.C.S. § 794; 42 U.S.C. § 1983; Article 89 of the New York Education Law §§ 4401, 4404, 4410; and the Regulations of the New York State Commissioner of Education, codified at 8 N.Y.C.R.R. § 200, et. seq.

141.    Defendant's failure to evaluate Plaintiff and provide her with an appropriate educational placement deprived her of her right to FAPE under IDEA, 20 U.S.C. § 1400, et seq., and the regulations promulgated thereunder.

142.    The facts of this case satisfy all three Burlington prongs, entitling Plaintiff to public funding of Plaintiff's tuition at JRC for the 2010-2011 school year.

143.    Defendant deprived Plaintiff of the free appropriate education guaranteed by the IDEA, 20 U.S.C. § 1400, et seq., and the regulations promulgated thereunder, and thus deprived her of rights secured by federal law in violation of 42 U.S.C. § 1983.

## THIRD CLAIM

144.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

145.    The IHO correctly found in his decision that Plaintiff was entitled to a Nickerson letter.

146.    The SRO incorrectly reversed and annulled the portion of the IHO Decision directing the issuance of a Nickerson letter to fund Plaintiff's placement at JRC for the 2010-2011 school year.

147.    The SRO's findings regarding Plaintiff's claim for an issuance of a Nickerson letter are based on erroneous factual and legal conclusions and therefore are not entitled to deference.

148.    More than sixty-five school days have passed since Plaintiff was referred to the CSE, without a placement for the student, entitling her under orders and stipulations entered in the class action Jose P., Nos. 79 Civ. 270, 79 Civ. 560 and 79 Civ. 2562 (E.D.N.Y. 1979), to be provided by Defendant NYC DOE with a "Nickerson letter" pursuant to which she may enroll in an appropriate New York State approved private school at Defendant's expense.

## FOURTH CLAIM

149.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

150.    Defendant's failure to offer Plaintiff an appropriate educational program in the least restrictive environment deprived Plaintiff of a FAPE for the 2008-2009 school year in violation of her rights under his rights under the IDEIA, 20 U.S.C. §§ 1400 et. seq.; Section 504 of the Rehabilitation Act of 1973, codified at 29 U.C.S. § 794; 42 U.S.C. § 1983; Article 89 of the New York Education Law §§ 4401, 4404, 4410; and the Regulations of the New York State Commissioner of Education, codified at 8 N.Y.C.R.R. § 200, et. seq.

151.    Defendant deprived Plaintiff of the free appropriate education guaranteed by the IDEA, 20 U.S.C. § 1400, et seq., and the regulations promulgated thereunder, for the 2008-2009 school year, and thus deprived her of rights secured by federal law in violation of 42 U.S.C. § 1983.

## FIFTH CLAIM

152.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

153.    Plaintiff suffers from Borderline Intellectual Functioning, Bipolar Disorder, Post-Traumatic Stress Disorder and other mental and developmental impairments that substantially limit one or more major life activities.

154.    Plaintiff has a record of such disabilities and is regarded has having such disabilities.

155.    Plaintiff is entitled under federal law (the IDEA) to a free, appropriate public education (FAPE) under the classification of Emotional Disturbance.

156.    After a full evidentiary hearing the IHO determined that because of Plaintiff's impairments she needs residential placement at JRC in order to receive FAPE for the 2010-2011 school year and ordered Defendant to develop an Individualized Education Plan (IEP) for residential placement at JRC.

157.    Defendant, in failing to reasonably accommodate Plaintiff's disabilities by providing her with an appropriate residential placement at JRC, has discriminated against Plaintiff on the basis of her disability in violation of the Americans with Disabilities Act, 42 U.S.C. §12132.

SIXTH CLAIM

158.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

159.    Defendant NYC DOE is a recipient of federal financial assistance.

160.    Plaintiff has physical and mental impairments that limit one or more major life activities.

161.    Plaintiff is entitled to FAPE under the IDEA and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, as amended by the Civil Rights Restoration Act of 1987.

162.    Defendant's CSE knew at least as of June, 2010 that Plaintiff requested re-evaluation and an IEP program recommendation of "Defer to CBST" for a residential therapeutic school placement.

163.    Defendant's unreasonable denial of Plaintiff's request for re-evaluation and IEP placement recommendation constitutes bad faith or at least deliberate indifference to the strong likelihood that Plaintiff's rights under Section 504 of the Rehabilitation Act were being violated.

164.    Defendant's failure to re-evaluate Plaintiff and provide her with an appropriate IEP placement resulted in denial of participation in a particular program and intentional discrimination against Plaintiff on the basis of her disability in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, as amended by the Civil Rights Restoration Act of 1987.

<u>SEVENTH CLAIM</u>

165.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

166.    The SRO dismissed Defendant's appeal of the IHO's order as moot directing Defendant to place Plaintiff at JRC for the 2010-2011 school year and develop an IEP for placement at JRC.

167.    The SRO did not annul the portion of the IHO's order directing Defendant to place Plaintiff at JRC for the 2010-2011 school year and develop an IEP for placement at JRC.

168.    The SRO decision dated January 24, 2011 became an agreement between the State and Plaintiff under 34 C.F.R. § 300.514(d), requiring funding Plaintiff's placement at JRC from January 24, 2011.

169.    At no time after the SRO decision did Defendant pay for Plaintiff's placement at JRC.

170.    Defendant violated and continues to violate the pendency provisions in the IDEA and New York Education Law.

## **RELIEF SOUGHT**

**WHEREFORE**, Plaintiff respectfully prays that this Court:

a)    Assume jurisdiction of this action;

b)    Receive the records of the administrative proceedings below, and hear additional evidence submitted by Plaintiff pursuant to 20 U.S.C. § 1415(i)(2)(C);

c)    Conduct an independent review of both the administrative record and additional evidence without any deference to the legal conclusions made by the State Review Officer below;

d)    Enter a judgment declaring that Defendant failed to comply with the IHO Decision to the extent that it ordered Defendant to provide Plaintiff with IEP for residential placement at JRC;

e)    Enjoin Defendant to provide Plaintiff with an appropriate IEP for residential placement at JRC as ordered by the IHO;

f)    Enter a judgment declaring that Plaintiff is entitled to "Nickerson letter" under orders and stipulations entered in class action Jose P., Nos. 79 Civ. 560 and 79 Civ. 2562 (E.D.N.Y. 1979) pursuant to which she may enroll in an appropriate New York State approved private school at Defendant's expense;

g)    Enter a judgment declaring that Defendant failed to provide Plaintiff a FAPE for the 2008-2009 school year;

h)    Enter a judgment declaring that Defendant failed to provide Plaintiff a FAPE for the 2010-2011 school year;

i)       Enjoin Defendant to pay Plaintiff's tuition for the 2010-2011 school year to JRC as an appropriate and equitable remedy under 20 U.S.C. §1412(a)(10)(vii)(C)(ii);

j)       Enter judgment declaring that Defendant's failure to provide FAPE violates Plaintiff's rights under the IDEA, the Americans with Disabilities Act 42 U.S.C. §12132, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, as amended by the Civil Rights Restoration Act of 1987, and New York Education Law.

k)       Enter judgment declaring that Defendant violated Plaintiff's stay put or pendency rights under the IDEA and the New York Education Law.

l)       Granting plaintiffs compensatory damages in an amount to be determined at trial.

m)       Award reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I) of the IDEA; and

n)       Grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

**PLEASE TAKE NOTICE,** pursuant to F.R.C.P. 38(b) Plaintiff hereby demands a jury trial of all claims arising under Section 504 of the federal Rehabilitation Act of 1973, 29 U.S.C. § 794.

Dated:  Brooklyn, New York
       May 20, 2011

ATTORNEY OF RECORD:

_____

Anton Papakhin (AP 4680)
LAW OFFICE OF ANTON PAPAKHIN, P.C.
*Attorney for Plaintiff*
1359 Coney Island Avenue
Brooklyn, NY 11230
Tel: (917) 270-1403
Fax: (718) 252-2216

Arthur R. Block (AB 6522)
ARTHUR BLOCK ATTORNEY AT LAW
*Attorney for Plaintiff (Co-counsel)*
230 Park Avenue, 23rd Floor
New York, NY 10169
Tel: (212) 405-3838
Fax: (212) 599-1759